1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LISA BOISSIERE,

        Plaintiff,

    v.

MICHAEL J. ASTRUE,

        Defendant.

_____/

No. C-09-02081 JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REMANDING FOR AWARD OF BENEFITS [Docket Nos. 23, 24]**

## I.  INTRODUCTION

Plaintiff, Lisa Boissiere, seeks review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her Application for disability insurance and Supplemental Security Income ("SSI") benefits under Titles II and XVI of the Social Security Act ("SSA").  Plaintiff asks the Court to reverse the Commissioner's denial of  benefits and remand with instructions to award benefits or, in the alternative, to remand for additional administrative proceedings.  For the reasons stated below, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES Defendant's Motion for Summary Judgment and remands Plaintiff's claim for award of benefits.[1]

## II.  BACKGROUND

### A.  Procedural Background

In September and November, 2005, Plaintiff filed concurrent applications for benefits, alleging an onset date of November 3, 2005.  Administrative Record ("AR") at 54.  The Social Security Administration denied the applications initially and again on reconsideration.  *Id.*

_____

[1]The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

United States District Court

For the Northern District of California

1   Plaintiff filed a timely request for hearing on February 9, 2007.  *Id*.  Plaintiff, represented by

2   attorney Sally Sklar, appeared and testified at a hearing on October 23, 2007.  *Id*.  Gerald Belchik,

3   Ph.D., an independent vocational consultant, also appeared and testified at the hearing.  *Id*.

4   Administrative Law Judge ("ALJ") Richard P. Laverdure presided over the hearing.  AR at 65.

5        In a decision dated January 17, 2008, the ALJ found that Plaintiff was not disabled and

6   therefore was not entitled to disability insurance benefits or SSI benefits under the SSA.  *Id*.

7   Plaintiff requested administrative review, and the Appeals Council denied the request on February

8   20, 2009, making the ALJ's decision the final decision of the Commissioner.  AR at 8.

9        Plaintiff filed this action pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction

10  to review the final decision of the Commissioner.  She has filed a motion for summary judgment

11  asking the Court to reverse the decision of the Commissioner, and the Commissioner has responded

12  with a cross-motion for summary judgment seeking affirmation of the Commissioner's final

13  decision.

14       **B**.      **Plaintiff's Background**

15       Plaintiff was born on July 19, 1968.  AR at 63.  She is a high school graduate and completed

16  three years of college.  AR at 233.   Prior to Plaintiff's alleged onset date, she was employed by Alta

17  Bates Hospital as a mental health worker.  AR at 43.

18       **C.**      **Plaintiff's Medical History**

19            **1.**      **Reports of Treating Physician Dr. Tsao (Primary Physician)**

20       The Administrative Record reflects that Dr. Chialin Tsao has been Plaintiff's treating

21  physician since December 15, 2004.  AR at 217.  Dr. Tsao saw Plaintiff approximately twice a

22  month between 2004 and 2007 for a variety of conditions, with frequent references in her reports to

23  headaches (often described as "severe"), chronic back pain, edema of hands, face and legs,

24  hypertension, acute sinusitis and dyspnea.  AR at 217-231.  In August 2005, Dr. Tsao referred

25  Plaintiff to a sleep clinic, the Sleep Disorders Center, which conducted a sleep study and diagnosed

26  Plaintiff  with sleep apnea.  AR at 20, 224-225, 230-231.  Subsequently, Dr. Tsao prescribed oxygen

27  therapy and use of a CPAP machine.  AR at 256.  In a Physical Capacities questionnaire completed

28

2

by Dr. Tsao on January 9, 2007, Dr. Tsao stated that Plaintiff was on 25 medications for

hypertension, diabetes, asthma, and heart disrhythmia as well as oxygen therapy.  AR at 350-351.

Dr. Tsao did not, however, complete the portion of that form in which the doctor is asked to address

the claimant's specific abilities, such as the ability to lift or carry, climb, balance, stoop, kneel,

crouch, crawl or reach.  *Id.*

   A treatment plan by Dr. Tsao dated July 2, 2007, submitted to Plaintiff's insurance company

in support of coverage, stated in part as follows:

   Medical Problems:

   1.  Cardiomegley
   2.  HTN
   3.  Atrial Fibrillation
   4.  Sleep Apnea
   5.  Asthma
   6.  Migraine Head Aches
   7.  O2 Therapy
   8.  Facial Pain/ chronic rhinitis (status post surgical removal of facial cist)
   9.  Back/low back pain
   10.  Hypothyroidism
   11.  Diabetes
   12.  Neuropathy in legs/feet
   13.  Pitting Edema/ LE

   Current restrictions and limitations:
   Physical restrictions and limitations: no sitting, standing reaching overhead, no standing, no
   lifting, no bending for more than 30 minutes.  No walking or standing and working in warm
   temperature. (i.e. cold or hot) and/or environment.

   Plan: continue treatment plan as stated – follow-up with Dr. Edelen for HTN and Atrial Fib.,
   Fitting Edema, Chronic Head Aches. - Medication and exercise plan – walk a straight way
   for at least 20 min. as tolerated per Dr. Edelen.  Monitor blood pressure with Dr. Tsao bi-
   weekly – Cardio megley - Echocardiogram quarterly.  Lower back pain - currently seeking
   authorization from Dr. Jamasbi for fourth cordisone [sic] injection, currently using lidoderm
   patches, vicoden , tens unit, bedrest and ice on low back.  Asthma - continue Observance for
   sputum discoloration, 02 therapy, take Medication cont. exercise regiment oxygen - monitor
   chronic bronchitis and use of Singular and inhalers, E.R. visits.

   Sleep apnea breathing @ 69 % F/u with sleep clinic Doctors Hospital in Sanpablo [sic] ca.
   cont. c-pap machine and 02 therapy.  Hypothyroidism change medication to arm thyroid 60
   mg.  Migraine Head Aches medication - Midrine.  Diabetes cont. to check Glucose blood
   level and follow dietary plan and exercise regimen.  Pt. needs to F/U with Department of
   Rehabilitation in Richmond Ca.  Still awaiting approval Re: Social Security Disability
   Claim.

AR at 357.

3

United States District Court

For the Northern District of California

2.      **Reports of Treating Physician John Edelen (Cardiologist)**

Plaintiff was treated by Dr. John Edelen, a cardiologist.  The Administrative Record contains reports from July 5, 2005 (AR 190), September 6, 2005 (AR 188), November 4, 2005 (AR 186), December 21, 2005 (AR 261), February 23, 2006 (AR 260), April 27, 2006 (AR 259) and July 11, 2006 (AR 289).  In his reports, Dr. Edelen noted that Plaintiff had puffy eyes and swollen hands and face, suffered from sleep apnea and was fatigued, had low back pain, and headaches.  *Id*.  On July 5, 2005, Dr. Edelen wrote, "[m]y impression is that she has signif. sleep apnea, snoring, obesity, falls asleep, not rested in a.m. , ↑ [Body Pain], headaches, fatigued."  AR at 189.  On September 6, 2005, Dr. Edelen wrote in his notes, "see sleep apnea study – 69% ox sat very tired, fatigued, working – hard to push herself."  AR at 188.  In a report of Plaintiff's February 23, 2006 visit, Dr. Edelen noted that Plaintiff was going to school and "getting As."  AR at 260.  In his most recent report in the Administrative Record, dated July 11, 2006, Dr. Edelen diagnosed Plaintiff with cardio megaly and noted that Plaintiff had "very high" blood pressure, used oxygen to walk, was "always in pain" and slept sitting up.  AR at 289.  Dr. Edelen had two echocardiograms conducted, on November 18, 2005 (AR 262) and July 24, 2006 (AR 287).  The summary of the first echocardiogram found "[n]ormal left ventricular function," "[m]ild tricuspid regurgitation," and "[m]ild concentric left ventricular hypertrophy."  AR at 262.  The later echocardiogram revealed "no significant change" in these findings.  AR at 287.

3.      **Reports From Pain and Rehabilitative Consultants Medical Group**

Plaintiff was seen by pain specialist Robert Jamasbi, as well as several of his associates at the Pain and Rehabilitative Consultants Medical Group, nine times between April 24, 2003 and December 16, 2004.  AR at 208-209.  His diagnosis was "displacement of lumbar invertebral disc without myelopathy. *Id*.  The records of the Pain and Rehabilitative Consultants Medical Group reflect that on December 16, 2004, Plaintiff was given an epidural injection.  *Id*.

4.      **Report of Examining Physician Dr. Momi (Agency Physician)**

Agency physician Jaskaran Momi examined Plaintiff and provided a report in which he stated that Plaintiff gave a history of sleep apnea, low back pain, migraine headaches, bronchial

4

asthma, hypertension and edema.  AR at  232-233.  He noted that Plaintiff "uses a CPAP machine along with 2 liters per minute of oxygen, because of low oxygen saturation at night and still continues to have a nap during the day."  AR at  232.  Dr. Momi stated that he had "a few pages of medical records available from Doctor's Hospital."  AR at  232.[2]  In describing Plaintiff's living situation, Dr. Momi wrote, "[s]he lives alone, her children live with her, they rent a house."  AR at 233.  Dr. Momi further states that "[s]he can do all her activities of daily living including laundry, shopping, cooking, cleaning, etc."   AR at  233.  In a section entitled "Impression," he stated as follows:

> 1. Obesity and history of sleep apnea, treated with CPAP.
> 2. History of low-back pain, detail of the exam given above, X-ray of the lumbar spine recommended, possible soft tissue in origin or early degenerative disc disease.
> 3. History of migraine headaches uses medications as needed.
> 4. Hypertension with no known complications.
> 5. Bronchial asthma, mild by history with a normal lung exam.
> 6. History of pain in the right lower leg, right foot and right knee with normal exam.  No edema.
> 7. Hypothyroidism on treatment, no symptoms.

AR at  234.  Dr. Momi's conclusions as to Plaintiff's Residual Functional Capacity were as follows:

> Based on the objective findings of the exam today, there is no limitation on sitting, standing or walking.  Limitations if any on bending and stooping should be based on the x-ray findings of the lumbar spines.  In my clinical judgment, she can do these activities occasionally.  The patient being obese could lift and carry 10 pounds of weight frequently and not more than 20 pounds of weight occasionally.  There is no limitation on reaching, handling, fingering, gripping and feeling.  She has a history of bronchial asthma should avoid working in the atmosphere containing chemical fumes, extremes of temperature and lot of humidity.

AR at  234-235.

## 5.    Report of Examining Physician Dr. Bruce (Agency Psychologist)

On December 9, 2006, Plaintiff was evaluated for psychological disability by Dr.Ranald Bruce.  AR at 302.  Dr. Bruce found that Plaintiff suffered from "mild to moderate depression" and "increased levels of anxiety about her situation."  AR at 303.  In summarizing Plaintiff's daily activities, he stated that she "gets up at 11 a.m. . . .cares for her children and cooks."  AR at 302.  He

_____

[2]Apparently, these were the report from the sleep study discussed above, as these are the only medical records contained in the Administrative Record from Doctor's Hospital.

further stated that "[s]he does no household chores but does shop." *Id.* Dr. Bruce concluded that Plaintiff could "carry out simple, detailed and complex instructions in an average work setting [and] should not have problems cooperating with coworkers." AR at 303. He further concluded that Plaintiff had no psychological limitations with respect to common daily activities but that she "could have problems with concentration and attention in an average work setting due to depression." *Id.*

### 6.     Records of Emergency Room Visits

The Administrative Record contains records of numerous visits to the emergency room. On May 19, 2001, Plaintiff arrived complaining of shortness of breath and was diagnosed with acute shortness of breath, congestive cardiomyopathy and asthma. AR at 364-365. In July 2002, Plaintiff went to the Alta Bates emergency room at least four times with complaints of shortness of breath, breast pain related to a previous breast reduction surgery, chest discomfort, and total body swelling. AR at 370 (listing visits to the Emergency Room on July 1, 2002, July 24, 2002 and twice on July 26, 2002). *Id.*

On July 1, 2002, Plaintiff was seen for chest pain and was diagnosed with an infection of the wound left from her surgery. *Id.* On July 24, 2002 Plaintiff was seen for swelling of her face, hands and feet. *Id.* The swelling of her feet was noted to be "especially severe." *Id.* Plaintiff reported that the swelling was persistent even though she had been switched to a new medication, Lasix. *Id.* Plaintiff also complained of breast and chest discomfort. *Id.* An electrocardiogram and chest radiograph were performed and Plaintiff was diagnosed with mild congestive heart failure with noncardiac chest pain and was treated with intravenous Lasix, potassium and Dilaudid. *Id.* On July 26, 2002, Plaintiff visited the emergency room twice, once in the early morning and once in the late afternoon. *Id.* In the first visit, Plaintiff again complained of persistent lower leg swelling, chest discomfort and shortness of breath. *Id.* Plaintiff was given intravenous Lasix and instructed to increase her Lasix dose from 40 mg to 80 mg daily. *Id.* In the late afternoon, Plaintiff returned to the emergency room complaining of total body swelling involving her feet, hands, knees and face. *Id.* Plaintiff also complained of shooting bilateral breast and chest pain. *Id.* Plaintiff reported that she had been "very uncomfortable at home and [had] not been sleeping well at night." AR at 371.

1    On March 11, 2005, Plaintiff went to the Alta Bates emergency room complaining of flu-like

2    symptoms, including cough, runny nose, sore throat and body aches.  AR at 191.  She was diagnosed

3    with bronchitis and was given Albuterol and Atrovent nebulized treatment, as well as morphine for

4    pain.  *Id*.

5    On June 11, 2006, Plaintiff visited the Alta Bates emergency room complaining of nasal

6    congestion and shortness of breath.  AR at 278.  She was diagnosed with an acute upper respiratory

7    infection and exacerbation of moderate persistent asthma.  *Id*.

8    **D.      The Administrative Hearing**

9    The ALJ held an administrative hearing on Plaintiff's claims on October 23, 2007.  At the

10   hearing, Plaintiff testified that she was being treated for high blood pressure, hypothyroidism,

11   headaches, back pain, sleep apnea and diabetes.  AR at  20.  She testified that she had pain in her

12   feet and legs as a result of her diabetes and that the medications she was taking for high blood

13   pressure hurt her stomach and made her sleepy.  AR at  21.  She testified further that she had to take

14   "a lot of naps" and that in an average day, between 8 a.m. and 6 p.m. she spent five hours sleeping.

15   AR at  22.  She testified that her high blood pressure also causes headaches and pain in the back of

16   her neck approximately two to three times a week.  AR at  22.  According to Plaintiff, her headaches

17   are so severe sometimes that she must go to the emergency room or stay in bed up to two days.  AR

18   at  22.  Plaintiff takes blood pressure and ear medicine to alleviate the pain caused by these

19   headaches.  *Id*.

20   With respect to Plaintiff's sleep apnea, she testified that she has a CPAP machine, which she

21   uses at night.  AR at  23.  When the ALJ asked Plaintiff whether that helped her sleep better at night,

22   Plaintiff stated, "[n]o, it doesn't help me sleep better at night, but it helps me get through the night.

23   But I wake up all through the night."  AR at  23.  Plaintiff testified that she uses three liters of

24   oxygen every night and also uses oxygen at least five times a week during the day, for

25   approximately five hours at a time.  AR at  23.  She testified that she has trouble breathing at night

26   and that she sleeps sitting up most of the time.  AR at  25.  According to Plaintiff, her children

27   rearrange her during the night to help her sleep better.  AR at  25.   Plaintiff further testified that her

28

**United States District Court**
For the Northern District of California

children do the cleaning and straightening up in the apartment and that if they don't do it, "it doesn't get done." AR at 25.

Plaintiff also testified about her back pain, stating that the pain is "very sharp," going down the right side of her buttocks to her legs. AR at 26. According to Plaintiff, she had received four epidural injections for her back pain. AR at 27.

Plaintiff testified that she has a high C-Reactive Protein, which Dr. Edelen told Plaintiff was associated with high inflammation of Plaintiff's body. AR at 26, 31. According to Plaintiff, "[m]y feet swell up real big. I can't wear regular shoes. . . I get cellulitis along my ankles where my feet start to swell up. My face is swelled up all the time and my hands." AR at 26.

Plaintiff testified that she was attending school as part of a vocational rehabilitation plan. AR at 27. She stated that she spent an hour and a half in class on Mondays and Wednesdays, and two hours on Thursdays and Fridays. AR at 27-28. She testified that she was on academic probation, however, because she had difficulty making it to class and had received an F in one class. AR at 28. She also stated that she had trouble concentrating in class and following what the teacher was saying, as well as sitting through the class, even though Plaintiff was in the disabled students program and was given accommodations by the teachers. AR at 28.

Plaintiff testified that she is taking at least 25 medications, that these medications make her sleepy, and that she has to take "a lot of naps." AR at 21, 29.

With respect to Plaintiff's sleep apnea, the ALJ asked Plaintiff's counsel whether there was any assessment in the medical records of what effect the CPAP had on Plaintiff's sleep apnea. AR at 32. Plaintiff's counsel answered that there was no further assessment of Plaintiff's sleep apnea following the initial study diagnosing the condition, though Dr. Tsao's records show that Plaintiff's oxygen therapy had been increased. *Id.*

Subsequently, the ALJ questioned the vocational expert, Gerald Belchik. In particular, the ALJ asked what types of jobs could be performed by an individual with the following limitations:

> Assume someone of Claimant's age, education, and experience and assume a capacity for light work with no work at any heights. No driving or hazardous machinery. By that I mean moving machinery that would pose a risk of serious injury or death. Crouch, crawl, kneel,

8

United States District Court

For the Northern District of California

1       stoop, balance, and use of ramps and stairs as occasional. Avoid concentrated exposure to
2       chemical fumes, temperatures extremes and hight humidity. A capacity for simple repetitive
    tasks with only occasional public interaction required.

3   AR at 44. The vocational expert testified that an individual with these limitations could work as: 1)

4   a mail clerk, DOT 209687026; 2) an information clerk, DOT 237367022 ; or 3) a bench packager.

5   AR at 44-45. The vocational expert testified that there are approximately 2,000 mail clerk positions

6   in the local economy and 77,000 mail clerk jobs nationally. AR at 44. He testified that there are

7   1,100 local information clerk jobs and 71,000 nationally. AR at 44. He testified that there are

8   approximately 1,200 bench packaging jobs locally and 13,000 or 14,000 nationally. AR at 45. All

9   of these jobs are classified as unskilled, with light exertion. AR at 44-45.

10       In response to the ALJ's question as to whether any of these jobs could be performed by an

11   individual who was "off task" for a significant period of the day, the vocational expert testified that

12   an individual could not be off task "more than ten percent of the work day or anywhere near that

13   really at the unskilled level." AR at 46. The ALJ also asked "if the person because of medication

14   problems needs to rest perhaps two or three times at least for perhaps half an hour, 45 minutes a

15   period, would the person be able to perform these [jobs]?" AR at 46. The vocational expert

16   answered that with this added limitation, the hypothetical individual would not be able to perform

17   any of the jobs listed above or indeed, any job. AR at 46.

18       **E.**      **The ALJ's Five-Step Analysis and Findings of Fact**

19       Disability insurance benefits are available under the Social Security Act when an eligible

20   claimant is unable "to engage in any substantial gainful activity by reason of any medically

21   determinable physical or mental impairment . . . which has lasted or can be expected to last for a

22   continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C.

23   § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such

24   severity that he is not only unable to do his previous work, but also "cannot, considering his age,

25   education, and work experience, engage in any other kind of substantial gainful work which exists in

26   the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in

27

28                                9

United States District Court
For the Northern District of California

1   establishing a disability.  *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir.), *cert. denied*, 519 U.S. 881

2   (1996).

3          The Commissioner has established a sequential five-part evaluation process to determine

4   whether a claimant is disabled under the Social Security Act.  20 C.F.R. § 404.1520(a).  At Step

5   One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity."

6   20 C.F.R. § 1520(a)(4)(i).  If he is, the Commissioner finds that the claimant is not disabled, and the

7   evaluation ends.  If the claimant is not engaged in substantial gainful activity, the Commissioner

8   proceeds to Step Two.

9          At Step Two, the Commissioner considers whether the claimant has "a severe medically

10  determinable physical or mental impairment," or combination of such impairments, which meets the

11  duration requirement in 20 C.F.R. § 404.1509.  20 C.F.R. § 1520(a)(4)(ii).   An impairment is severe

12  if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20

13  C.F.R. § 404.1520(c).  In addition, the physical or mental impairment (or combination of

14  impairments) must have lasted, or must be expected to last, for a continuous period of 12 months.

15  20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509.  If the claimant does not have a severe

16  impairment for the required duration, the Commissioner finds the claimant not disabled and the

17  evaluation ends at this step.  C.F.R. § 404.1520(c).  Age, education, and work experience are not

18  considered at this step.  *Id*.

19         At Step Three, the Commissioner considers whether the claimant's impairment, or

20  impairments, "meets or equals" one of the Social Security Administration's compiled listings of

21  impairments that the Commissioner has established as disabling.  20 C.F.R. § 404.1520(a)(4)(iii).  If

22  the claimant's impairment meets one of these listed impairments, the Commissioner will find the

23  claimant disabled.  If the impairment does not meet one of the listed impairments, the process

24  continues to Step Four.

25         At Step Four, the Commissioner considers whether the claimant, in light of his residual

26  functional capacity ("RFC"), can continue to perform work he has performed in the past. 20 C.F.R.

27  § 404.1520(a)(4)(iv).  Based on the relevant medical evidence and other evidence in the record, the

28
                                                        10

Commissioner will assess the claimant's RFC to determine whether the claimant can do his past work. 20 C.F.R. § 404.1520(e).  If the RFC assessment determines that the claimant can perform his past work, the Commissioner will find him not disabled.  20 C.F.R. § 404.1520(f).  If the RFC assessment determines that the claimant cannot perform his past work, then the claimant proceeds to Step Five of the evaluation.

At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can "make an adjustment to other work."  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner will find him disabled.  *Id*.  At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of his impairments, age, education, and work experience, can adjust to other work in the national economy, and that such a job actually exists.  *Distasio v. Shalala*, 47 F.3d 348, 349 (9th Cir. 1995).

At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 3, 2005, the alleged onset date.   AR at 56. Therefore, he continued to Step Two.

At Step Two, the ALJ found that the Claimant had the following severe impairments: obesity, sleep apnea, diabetes mellitus II, asthma, migraine headaches, lumbar degenerative disc disease, and depression.  AR at 56.

At Step Three, the ALJ found that the Claimant did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ noted that "[w]hile obesity is no longer a listed impairment, it is a medically determinable impairment, and its cumulative effects must be considered at Step 3 . . . ."  AR at 57. He went on to conclude that "the objective medical evidence does not suggest the cumulative effects of obesity meet the criteria set forth in any section of the Listing of Impairments."  AR at 57.

At Step Four, the ALJ found that Plaintiff had the following residual functional capacity:

> . . .the claimant has the residual functional capacity to perform light work (lift 10 pounds frequently and 20 pounds occasionally and sit/stand/walk for six hours each in an eight hour work day) except she cannot climb ladders, ropes or scaffolds, can occasionally stoop, crouch, crawl, kneel, balance, or climb stairs, and must avoid work environments with concentrated exposure to chemical fumes, temperature extremes, or high humidity.  The

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

claimant cannot work where she is required to drive or work around dangerous machinery or at heights.  She is able to work with occasional required public interaction and she can be off-pace up to 10 percent of the day.

AR at 59.  In reaching this RFC, the ALJ concluded that although Plaintiff's medically determinable impairments could be expected to cause some of the alleged symptoms, her statements about the intensity, persistence and limiting effects of her symptoms were not entirely credible.  AR at 60.  He stated that his conclusion was based primarily upon the medical evidence in record.  AR at 60.

In assessing the medical evidence, the ALJ rejected Dr. Tsao's opinion that Plaintiff was "chronically disabled," finding that it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and it [was] inconsistent with other substantial evidence in the record."  AR at 60.  He noted that there were no X-rays, MRIs or CT scans to determine the cause of Plaintiff's back pain, no pulmonary function test, and that her echocardiogram revealed only mild results.  AR at 62.  He further stated that Plaintiff's sleep apnea was "controllable with a CPAP machine," and that her diabetes and asthma were "controlled."  AR at 62.  The ALJ notes that Plaintiff "has been ordered to lose weight and yet remains morbidly obese."  AR at 62.  In addition, the ALJ cited to the findings of Dr. Momi, an agency physician who examined Plaintiff.  AR at 62.  In particular, the ALJ stated that according to Dr. Momi , Plaintiff was able to handle her daily activities of living.  AR at 62.  The ALJ also noted that Plaintiff was "able to attend school and was getting all As in her nursing program."  AR at 62.  In a footnote, the ALJ acknowledged that Plaintiff's counsel had asserted that Plaintiff was on academic probation for receiving a failing grade but dismissed this assertion because there were no school records in evidence and in any event, there was no indication the failing grade was due to Plaintiff's impairments.  AR at 62.  The ALJ noted that although Plaintiff had testified to a lower level of activity recently, there was "no objective evidence to support this decreased capacity."  AR at 62.

At Step Five, the ALJ found that Plaintiff was unable to perform her past relevant work as a mental health worker.  AR at 63.  He went on to conclude, based on the testimony of the vocational expert, that Plaintiff could work as a mail clerk, an information clerk or a bench packager, and that

United States District Court

For the Northern District of California

1  such jobs existed regionally and nationally in significant number.  AR at 64.  As a result, he found

2  that Plaintiff was not disabled.  *Id*.

3      **G.      Contentions of Parties**

4          Plaintiff asserts that the ALJ erred in a number of respects and therefore, his decision should

5  be reversed.  First, Plaintiff asserts that the RFC was not supported by substantial evidence because:

6  1)  the ALJ failed to consider the effects of her obesity, in combination with her other impairments,

7  on her RFC and in particular, the impact of her sleep apnea, which is closely related to her obesity;

8  2) the ALJ did not properly evaluate the opinions of Dr. Tsao, dismissing them as unsupported by

9  the medical evidence, even though Dr. Tsao's records include extensive clinical and laboratory

10 findings, including the sleep clinic study on which the sleep apnea diagnosis was based; 3) the ALJ

11 failed to give proper weight to Dr. Tsao's opinion as Plaintiff's treating physician, instead accepting

12 the opinion of Dr. Momi, who examined Plaintiff only once; and 4) if the ALJ found Dr. Tsao's

13 records to be insufficient, he should have developed the record by contacting her to clarify her

14 opinion regarding Plaintiff's RFC.

15         Second, Plaintiff argues that the ALJ did not properly evaluate Plaintiff's subjective

16 complaints, failing to offer clear and convincing reasons for rejecting her testimony, even though he

17 found no evidence of malingering.  Plaintiff asserts that in rejecting her testimony, the ALJ

18 improperly relied on certain daily activities without addressing how they translated to an ability to

19 perform similar functions on a consistent basis in a work setting.  He also erred, according to

20 Plaintiff, when he stated that Plaintiff was receiving A's at nursing school, even though Plaintiff's

21 counsel had told the ALJ at the hearing that she was currently on academic probation because of

22 poor grades.  Plaintiff argues that because the ALJ failed to support his rejection of Plaintiff's

23 subjective complaints, the Court should credit Plaintiff's testimony as true and award benefits.

24         In its Opposition/Cross-Motion, Defendant argues that: 1) the ALJ's RFC was supported by

25 substantial evidence; and 2) the ALJ properly discounted Plaintiff's subjective complaints.  With

26 respect to the RFC, Defendant asserts that the ALJ adequately considered Plaintiff's obesity, that he

27 properly disregarded the opinion of her treating physician and that he reasonably relied on the

28

United States District Court

For the Northern District of California

1    opinion of Dr. Momi.  With respect to the ALJ's rejection of Plaintiff's subjective testimony,

2    Defendant asserts that the ALJ properly concluded that the objective evidence did not support "the

3    extent of Plaintiff's subjective complaints" and that he cited to the fact that Plaintiff's "treatment

4    records did not record observed clinical examination findings suggestive of diability."  Defendant

5    further asserts that the ALJ's reliance on Plaintiff's daily activities in support of his credibility

6    finding was reasonable, even though Defendant concedes that the evidence relating to Plaintiff's

7    daily activities is "somewhat equivocal." Similarly, Defendant asserts that Plaintiff's ability to get

8    A's in school supported the ALJ's conclusion.  Finally, Defendant argues that even if the Court were

9    to find that the ALJ's decision was not supported by substantial evidence, or there was legal error,

10   the Court should not award benefits but rather, should remand for further proceedings.

11   **III.    ANALYSIS**

12        **A.    Legal Standard**

13        When reviewing the Commissioner's decision, the Court takes as conclusive any findings of

14   the Commissioner which are free from legal error and "supported by substantial evidence."  42

15   U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind accepts as adequate to

16   support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence

17   means "more than a mere scintilla" but "less that a preponderance."  *Id*.  *Desrosiers v. Sec'y of*

18   *Health & Human Servs*., 846 F.2d 573, 576 (9th Cir. 1988).  Even if the Commissioner's findings

19   are supported by substantial evidence, they should be set aside if proper legal standards were not

20   applied when using the evidence to reach a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir.

21   1978).  In reviewing the record, the Court must consider both the evidence that supports and detracts

22   from the Commissioner's conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

23        **B.    Whether the RFC was Supported by Substantial Evidence**

24        Plaintiff asserts that the ALJ's RFC was not supported by substantial evidence because he

25   failed to adequately consider Plaintiff's obesity in determining her limitations and also did not offer

26   legitimate reasons for rejecting the opinions of Plaintiff's treating physician, Dr. Tsao, in favor of

27   the opinions of the agency physician who examined Plaintiff, Dr. Momi.  The Court concludes that

28                                                    14

the ALJ offered legitimate reasons for rejecting the opinion of Dr. Tsao.  However, the ALJ failed to adequately consider Plaintiff's obesity and therefore, the RFC is not supported by substantial evidence.

**1.       Rejection of Dr. Tsao's Opinion**

As noted above, Dr. Tsao opined that Plaintiff was "chronic[ally] disabled" and found that in light of Plaintiff's impairments, she could not sit, stand, reach overhead,  lift, or bend for more than 30 minutes and she could not work in a hot or cold environment.[3]   AR at 357.   Dr. Momi, on the other hand, found no limitations on sitting, standing or walking and further concluded that Plaintiff could bend or stoop occasionally, lift and carry 10 pounds of weight frequently and not more than 20 pounds of weight occasionally.  AR at 234-235.  He also found that there was no limitation on reaching, handling, fingering, gripping and feeling.  *Id.*  The ALJ rejected Dr. Tsao's opinion on the basis that it was "not well-supported by medically acceptable clinical and laboratory diagnostic techniques and it [was] inconsistent with other substantial evidence in the record."  AR at 60.  In particular, the ALJ found that Dr. Tsao's limitations were inconsistent with Dr. Momi's statement that Plaintiff could perform all of her activities of daily living, and with a notation in the record indicating that Plaintiff was getting A's at school.  AR at 62.

Although the ALJ may consider many sources, the opinion of a treating physician normally is given special weight.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996).  If the ALJ decides to disregard the treating physician's opinions, he "must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983).   The Court is not persuaded that Plaintiff's daily activities or her school records satisfy this standard.  As to the former, Dr. Momi has included a single sentence in his report stating that Plaintiff can do "all her activities of daily living including

---

[3]In the administrative record, Dr. Tsao does not expressly address the question of whether Plaintiff's sleep apnea might give rise to additional limitations, such as drowsiness, inability to focus or a need to rest during the work day.  Thus, the question of whether the ALJ erred in rejecting the opinions of Dr. Tsao has little bearing on the issue of whether the ALJ's RFC adequately reflected limitations resulting from Plaintiff's sleep apnea, which is discussed below.

15

United States District Court

For the Northern District of California

1    laundry, shopping, cooking, cleaning, etc." AR at 233.  This followed directly on the heels of a

2    sentence in which Dr. Momi stated both that Plaintiff lived alone and that she lived with her

3    children, casting some doubt on the accuracy with which Dr. Momi reported Plaintiff's statements.

4    Further, this statement is in direct conflict with Plaintiff's own testimony, as well as the statement of

5    the Agency Psychologist, Dr. Bruce, who reported that "Plaintiff does no household chores." AR at

6    25, 302.  Yet the ALJ offered no explanation for crediting Dr. Momi's statement over this

7    conflicting evidence.  In the absence of any explanation of his reasoning, the ALJ's reliance on Dr.

8    Momi's statement is not supported by substantial evidence.

9         Similarly, it is not clear why the ALJ rejected Plaintiff's testimony that she was on academic

10   probation and had received an F in one class due to her inability to concentrate.  The ALJ apparently

11   relied on a notation by Dr. Edelen from a visit on February 23, 2006 – almost two years before

12   Plaintiff's  testimony –  that Plaintiff was getting A's.  The notation is not necessarily inconsistent

13   with Plaintiff's testimony; to the extent there could be some inconsistency, however, the ALJ had an

14   obligation to explain why he rejected Plaintiff's testimony if he was going to rely on Plaintiff's

15   success at school in support of his RFC.  His reliance on the lack of academic records showing that

16   Plaintiff had received an F rings hollow, given that there were also no records in the Administrative

17   Record showing that Plaintiff received A's in her classes.   In short, the ALJ's reliance on Plaintiff's

18   school grades as a basis for rejecting Dr. Tsao's RFC is not supported by substantial evidence.

19        On the other hand, the Court finds that the ALJ's conclusion that Dr. Tsao's opinion is not

20   supported by  medically acceptable clinical and laboratory diagnostic techniques is a legitimate basis

21   for rejecting the limitations found by Dr. Tsao.  While Dr. Tsao's records contain extensive notes

22   and laboratory results documenting Plaintiff's medical conditions, they do not include detailed

23   medical findings relating to the specific limitations that were rejected by the ALJ.  Nor is it clear the

24   basis on which Dr. Tsao concluded that Plaintiff was "chronic[ally] disabled," as Dr. Tsao expressed

25   this opinion on a Residual Functional Capacity form without completing the part of the form in

26   which the doctor is asked to identify specific limitations.  *See* AR at 350-351.  Further, the ALJ

27   points to the absence of x-rays, MRI's or CT's of the claimant's back to determine the cause of her

28
                                                    16

back pain.  AR at 62.  Similarly, there is no pulmonary function test and the July 2006

echocardiogram reveals only mild results.  *Id*.  Therefore, the Court concludes that the ALJ did not

err in disregarding the opinion of Dr. Tsao with respect to the limitations discussed above.

> **2.**      **The Impact of Obesity on Plaintiff's RFC**

In developing a claimant's RFC, the ALJ must consider limitations imposed by all of the

claimant's impairments in combination, even those that are not severe.  SSR 96-8p; *see also Burch v.

Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).  Obesity alone is not a qualifying disability but must be

considered in disability assessments and remains classified as a "determinable impairment that can

be the basis for a finding of disability."  64 FR 46122; *see also* SSR 02-01 (noting that "[the effects

of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This

can lead to drowsiness and lack of mental clarity during the day").  Where a claimant is obese, the

ALJ has a special duty to "fully and fairly develop the record and to assure that the claimant's

interests are considered."  *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (holding that ALJ

erred in failing to consider claimant's obesity in assessing her ability to work); *see also Jaroch v.

Barnhart*, 2004 WL 1125050 (N.D. Cal.) (same).   Mere mention of a claimant's obesity is not

enough to satisfy this requirement.  *Norman v. Astrue*, 750234 (N.D. Oh. March 10, 2010)

(overruling objections by Commissioner to Report and Recommendation in which court held that

ALJ had not adequately considered claimant's obesity and noting that "[t]he ALJ appears to have

analyzed [claimant's] limitations not as they actually existed, but rather from the hypothetical

standpoint of what [claimant's] limitations would be if he lost weight as recommended by his

physician").

Here, Plaintiff has been diagnosed with sleep apnea following a comprehensive evaluation

by the Sleep Disorders Center.  AR at 20, 224-225, 230-231.  The diagnosis is acknowledged by

numerous doctors, including both treating physician Dr. Tsao and the agency doctor, Dr. Momi, as is

the fact that Plaintiff uses a CPAP machine at night, along with oxygen.  *See*, *e.g.,* AR at 232 (Dr.

Momi), 254 (Dr. Tsao).   The ALJ does not question the sleep apnea diagnosis.  Instead, he

dismisses Plaintiff's sleep apnea on the basis that it is "controllable with a CPAP machine."  There

17

United States District Court

For the Northern District of California

is no evidence in the record to support this conclusion.  Rather, the only evidence in the record  is to the contrary.   In particular, at the hearing, Plaintiff testified that even with the CPAP machine, she wakes up all through the night, that she takes frequent naps during the day and that she sleeps approximately five hours during the day.  AR at 21-23.  She also testified that she was on academic probation because of her inability to concentrate in class.  AR at 28. Even Dr. Momi, who the ALJ found to be reliable, noted that Plaintiff needs to take a nap during the day because of her sleep apnea.  AR at 232.  And when the ALJ asked at the hearing whether there had been any evaluation of the effect of the CPAP machine on Plaintiff's sleep apnea, Plaintiff's counsel answered that there had not.

The ALJ had a duty to develop the record to determine the impact of Plaintiff's sleep apnea on her ability to work.  He failed to do so.  Given that the vocational expert testified that in the case of the unskilled jobs he identified in response to the ALJ's hypothetical, an individual would not be permitted to be off task "anywhere near" 10% of the work day, and that an individual who needed to rest two or three times a day for 30 to 45 minutes would not be able to perform *any* job, the question of whether Plaintiff's sleep apnea is controlled was a key question in determining whether Plaintiff was disabled.  Because the ALJ failed to develop the record on this question, the Court concludes that the ALJ's RFC is not supported by substantial evidence.

### C.       Whether the ALJ Properly Disregarded Plaintiff's Subjective Testimony

A claimant's credibility is the degree to which the claimant's statements can be believed and accepted as true.  SSR 96-7p at 4.  The ALJ must make credibility findings to determine the truth of a claimant's description of her symptoms and pain.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (holding ALJ responsible for determining credibility and resolving conflicts in medical testimony).  When making such findings, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements.  The reasons for the findings must be grounded in the evidence and articulated in the determination or decision."  *Id*.  Testimony cannot be discredited solely because it is not supported by objective medical evidence.  *See* SSR 96-7p; *Light v. SSA*, 119 F.3d 789, 792 (9th Cir. 1997).  Further, when there is no affirmative evidence

18

1    of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's

2    testimony.  *Burch v. Barnhart*, 400 F.3d 676 (9th Cir. 2005) (citation omitted).

3          The Ninth Circuit has articulated several factors that can be considered in determining

4    whether a claimant's pain or symptom testimony is credible.  These include the claimant's

5    "reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his

6    conduct, his daily activities, his work record, and testimony from physicians and third parties

7    concerning the nature, severity, and effect of the symptoms of which he complains."  *Light*, 119 F.3d

8    at 792-93.  If a claimant has proffered medical evidence that indicates the presence of an impairment

9    that could cause some pain, an ALJ may not base his disbelief of a claimant's testimony on the sole

10   fact that it is unsupported by medical findings.  *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).

11   The Ninth Circuit's rationale for this rule lies in the fact that "pain is a subjective phenomenon."  *Id.*

12         Here, the ALJ found that "the claimant's medically determinable impairments could

13   reasonably be expected to produce some of the alleged symptoms, but that claimant's statements

14   concerning the intensity, persistence and limiting effects of these symptoms are not entirely

15   credible."  AR at 60.  In reaching this conclusion, the ALJ rejected Plaintiff's testimony regarding

16   her pain and shortness of breath.  AR at 62.   He also dismissed her testimony regarding her

17   problems at school and her inability to perform some daily activities, such as household chores,

18   finding instead that she was receiving A's and performing all of the activities of daily living,

19   including household chores.  AR at 62.  Further, by failing to include limitations in the RFC relating

20   to Plaintiff's testimony that she was drowsy, had trouble concentrating, needed to take frequent naps

21   and slept approximately five hours a day, the ALJ implicitly rejected this testimony as well.

22         Because the ALJ made no finding that Plaintiff was malingering, he was required to offer

23   clear and convincing reasons for rejecting Plaintiff's testimony.  He did not do so.  First, for the

24   reasons discussed above, the Court rejects the ALJ's  reliance on Plaintiff's success at school and

25   performance of her daily activities as a basis for rejecting Plaintiff's testimony about her symptoms.

26   Second, the ALJ did not offer *any* reasons for discounting Plaintiff's testimony that her medications

27   make her sleepy, that she gets little sleep at night, and that she must take many naps during the day.

28

United States District Court

For the Northern District of California

1     Third, the remaining reason offered by the ALJ, that Plaintiff's symptoms are not fully supported by

2     objective medical evidence, does not, by itself, provide a sufficient basis on which to reject Plaintiff's

3     testimony about her symptoms.

4          The Court concludes that the ALJ failed to provide clear and convincing reasons supported by

5     substantial evidence for rejecting Plaintiff's testimony about her symptoms.

### D. Whether the Court Should Remand for Award of Benefits or for Further Proceedings

8          Having determined that the ALJ has erred, the Court must address whether to remand for

9     further administrative proceedings or simply remand for award of benefits. "The decision whether to

10    remand the case for additional evidence or simply to award benefits is within the discretion of the

11    court." *Stone v. Heckler*, 761 F.2d 530, 533 (9th Cir.1985). Typically, a court awards benefits where

12    no useful purpose would be served by further proceedings. *Varney v. Secretary of Health and*

13    *Human Services*, 859 F.2d 1396, 1399 (9th Cir. 1988). Thus, where an ALJ fails to articulate

14    sufficient reasons for disregarding testimony about a claimant's symptoms *and* that testimony, if

15    credited, would establish disability, the Court will not remand solely to allow the ALJ to make

16    specific findings. *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995). In *Varney*, the Court of Appeals

17    explained the reason for this rule as follows:

> Requiring the ALJs to specify any factors discrediting a claimant at the first opportunity helps to improve the performance of the ALJs by discouraging them from "reach[ing] a conclusion first, and then attempt[ing] to justify it by ignoring competent evidence in the record that suggests an opposite result." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir.1984). It helps to ensure that pain testimony will be carefully assessed and its importance recognized. *See Howard, 782 F.2d at 1488.* Moreover, it avoids unnecessary duplication in the administrative hearings and reduces the administrative burden caused by requiring multiple proceedings in the same case. Perhaps most important, by ensuring that credible claimants' testimony is accepted the first time around, the rule reduces the "delay and uncertainty" often found in this area of the law, see *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983) (citation omitted), and ensures that deserving claimants will receive benefits as soon as possible. As already noted, applicants for disability benefits often suffer from painful and debilitating conditions, as well as severe economic hardship. Delaying the payment of benefits by requiring multiple administrative proceedings that are duplicative and unnecessary only serves to cause the applicant further damage – financial, medical, and emotional. Such damage can never be remedied. *See Lopez*, 713 F.2d at 1437. Without endangering the integrity of the disability determination process, a principal goal of that process must be the speedy resolution of disability applicants' claims.

859 F.2d at 1398-1399.

The considerations highlighted in *Varney* are apparent here.  Notwithstanding the fact that Plaintiff was diagnosed with sleep apnea (a diagnosis that was supported by a detailed study and accepted without question by the ALJ), the ALJ failed to credit Plaintiff's testimony that she is frequently very tired, takes several naps during the day and sleeps approximately five hours during the day.  Instead, he concluded, without any medical evidence to support the conclusion, that Plaintiff's sleep apnea was "controllable" with a CPAP machine.  The testimony of the vocational expert, however, established that if Plaintiff's testimony regarding the symptoms related to her sleep apnea were credited, she would be unable to perform any of the jobs that were identified by the vocational expert, upon which the ALJ relied in support of his finding of non-disability, or indeed, any job at all.  In particular, the ALJ asked the vocational expert if Plaintiff could perform any of the jobs he identified if she needed to rest "perhaps two or three times at least for perhaps half an hour, 45 minutes a period." AR at 46.  The vocational expert responded that with this added limitation, Plaintiff would not be ably to perform *any* job.  *Id*.  In light of this evidence, the Court concludes that a remand for further proceedings would serve no useful purpose and would unnecessarily draw out an already-lengthy process.   Accordingly, the Court concludes that an award of benefits is the appropriate remedy.

**IV.     CONCLUSION**

For the foregoing reasons, the Court GRANTS Plaintiff's motion and DENIES the Commissioner's motion.  The Court reverses the ALJ's decision and remands Plaintiff's claim for an award of benefits.

IT IS SO ORDERED.

Dated:  May 19, 2010

_____
JOSEPH C. SPERO
United States Magistrate Judge